**ROBINSON BROG LEINWAND GREENE**                    Return Date: January 19, 2017
  **GENOVESE & GLUCK P.C.**                          at 10:00 a.m.
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
*Attorneys for the Debtor and Debtor in Possession*
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

In re:                                               Chapter 11

AC I TOMS RIVER LLC,                                 Case No.:  16-22023 (RDD)


                              Debtor.
----------------------------------------------------------X

DEBTOR'S RESPONSE TO MOTION OF RCG LV DEBT IV NON-REIT ASSETS
HOLDINGS, LLC PURSUANT TO 11 U.S.C. §§105 (A), 502 AND 506 (A) AND RULES
3001 (F) AND 3012 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE TO
DETERMINE SECURED CLAIM AND OBJECTIONT TO RCG CLAIM

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        The debtor and debtor in possession, AC I Toms River LLC (the "Debtor"), by its

attorneys, submits this response to the Motion by RCG LV Debt IV Non-REIT Assets Holdings,

LLC ("RCG") Pursuant to 11 U.S.C. Sections 105(a), 502 and 506(a) and Rules 3001(f) and

3012 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") to Determine

Secured Claim (the "Motion") and files this objection to the RCG Claim, and respectfully

represents as follows:

## PRELIMINARY STATEMENT

1.　　　This Response is submitted in connection with RCG's Motion to determine the value of its secured claim.  The Debtor does not deny that RCG has a claim secured by the Property in the Debtor's case.  Debtor's response to the Motion and its objection to the RCG Claim as detailed herein is based upon the asserted amount of the claim and how that claim amount was calculated.   Debtor submits RCG's filing of its claim and the making of this Motion confers jurisdiction over the claim to this Court and further submits that the claim is overstated and that an accounting is required before this Court can determine the amount of the claim.

## BACKGROUND

2.　　　On January 8, 2016, (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  In addition to its petition for relief, on February 22, 2016, the Debtor filed its schedules of assets and liabilities and lists of creditors and executory contracts required pursuant to Section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules.

3.　　　No committee, trustee or examiner has been appointed in the Debtor's case.

4.　　　The Debtor is the owner of the real property and improvements thereon located at 1400 Hooper Avenue, Toms River, New Jersey from which the shopping center commonly known as Hooper Commons operates (the "Property").  The Property consists of 28 storefronts, of which 25 are occupied.  The anchor tenants at the Property are Dollar Tree, DSW and Michaels.  The Property is currently the subject of a foreclosure action commenced by RCG (the "Foreclosure Action") in connection with a June 2011 mortgage loan (the "Loan") RCG

extended to the Debtor pursuant to a Mortgage Loan Agreement (the "Loan Agreement"),
evidenced by a promissory note in the original principal amount of $17,820,000.

5.      In October 2014, CBRE was appointed as Receiver ("CBRE" or "Receiver") for
the Property in connection with the Foreclosure Action as defined below.

6.      The Debtor's Chapter 11 Case filing was precipitated by the entry of an order
denying the Debtor's objection to the final judgment calculation submitted by RCG seeking
entry of a final judgment in the Foreclosure Action which is pending in the Chancery Court in
Ocean County, New Jersey, docketed as Docket No. F-022458-14.

7.      The Debtor is 100% owned by AC I Toms River Mezz LLC, which in turn is
100% owned by AC I Inv Toms River LLC, which is owned by Tibor Klein (35%), Chana
Ringel (25%), Michael Krull (10%) and AC I Retail Equity Fund I LLC (30%).  AC I Retail
Equity Fund I LLC is 100% owned by Benjamin Ringel.

**THE RECEIVER STIPULATION**

8.      After the Petition Date, the Debtor negotiated a stipulation with RCG and CBRE,
Inc., in its capacity as Receiver for the Property, to remain in possession and operation of the
Property through and including April 15, 2016, subject to further written extension (the
"Receiver Stipulation") (ECF doc. no. 14).  The receivership period has been continuously
extended by written agreement between the Debtor, RCG and the Receiver.  Pursuant to the
Receiver Stipulation, the Receiver is fully authorized to continue to act in accordance with the
October 6, 2014 Receiver Order entered in the Foreclosure Action, including, but not limited to,
managing, overseeing and operating the Property and collecting the rents, income and profits
generated therefrom, and including, but not limited to making timely debt service payments to

RCG.  The Receiver Stipulation also requires the Receiver to provide certain management

reports, the most recent of which covers the period October 2016.   According to these monthly

reports, since the Petition Date, RCG has received a total of $1,692,596.64 in debt service

payments which are identified in the reports as "mortgage principal".

**THE RCG CLAIM**

9.      RCG filed its proof of claim on May 17, 2016 in the amount of $22,045,715.03.

The Motion seeks an order confirming that RCG is entitled to an amount no less than

$23,157,997.59 as of October 31, 2016 (the "Claim") which Claim consists of the following

components:

> Principal: $17,730,689.83
> Accrued prepetition default interest $3,221,962.29
> Accrued postpetition default interest: $684,648.34
> Attorney's fees and other costs: $629,697.13
> Payment after default premium: $891,000

10.     As will be more fully set forth below, Debtor does not deny that RCG has a claim

secured by the Property in the Debtor's case.  Debtor's response to the Motion and objection to

the RCG Claim is based upon the asserted amount of the Claim and how the Claim amount was

calculated.   In support thereof, Debtor submits this response to the Motion and objection to the

RCG Claim.

**THE LOAN AGREEMENT, THE NOTICE OF DEFAULT AND ACCELERATION
AND RCG'S POST DEFAULT CONDUCT**

11.     The Loan Agreement between the Debtor and RCG is particularly onerous and the

Debtor submits in large part that it is against public policy as the Loan Agreement by its own

language at Section 10.23 denies Borrower the right to cure an Event of Default:

> The use of the phrase "during the continuance of an Event of Default" and similar

phrases in this Agreement shall not be deemed to grant Borrower any right to cure
an Event of Default, and each Event of Default shall continue unless and until the
same is waived by Lender in writing in accordance with the requirements of the
Loan Documents.

See Loan Agreement, Section 10.23.

12.     According to the Motion and the default letter attached as Exhibit E thereto, RCG

defaulted the Debtor by letter dated January 13, 2012 (the "Default Date"), declaring the entire

unpaid balance of the Loan along with interest and any other sums due RCG to be immediately

due and payable.  The default letter also noted that the occurrence of the Event of Default as

defined in the Loan Agreement is a Triggering Event which permits RCG to "implement a cash

sweep under Article III Cash Management provisions of the Loan Agreement at this time".

Section 3.1 of the Loan Agreement gives RCG as the Lender control over the accounts

established in connection with RCG extending the Loan to Debtor, including the Lockbox

Account. Once the cash sweep is in effect, as set forth in Section 3.21 of the Loan Agreement,

the Debtor "shall have no further right in respect of the Accounts".

13.     Therefore, once an Event of Default occurs, RCG controls the Lockbox Account

and all disbursements made therefrom which disbursements are governed by Sections 3.7 and

3.21 of the Loan Agreement.

14.     The Mortgage Loan Agreement at Section 3.7 specifically addresses how

payments are to be made once the cash sweep goes into effect: "Lockbox Bank" which is defined

as "any Eligible Institution selected by Lender", (a)…**shall** withdraw all funds on deposit in the

Lockbox Account on the date immediately preceding each Payment Date…; (b) … "**shall**

disburse all funds in the Lockbox Account in the following order of priority… ".

15.     Section 3.7 of the Loan Agreement however is modified by the language of

Section 3.21 of the Loan Agreement which provides RCG with discretion as to how to apply the amounts maintained in the Lockbox Account as follows: "…notwithstanding anything to the contrary contained in this Agreement or in the Security Instrument, Lender may apply the amounts of such accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt". This purported exercise of discretion however cannot be read to permit a lender to accumulate funds over which it has sole dominion and control, and then charge the borrower default interest and late fees, which is exactly what happened in this case and is one of the reasons why the RCG Claim must be entirely recalculated.

16.    RCG's conduct as against the Debtor subsequent to the Default Date in failing to apply funds to pay down the Loan obligation despite it having sole dominion and control over the Lockbox Account and despite the availability of funds to pay down the obligation, has significantly harmed the Debtor, including but not limited to substantially increasing the purported amounts due under the Loan Agreement, including late fees and attorneys fees for which RCG now seeks to be paid. This conduct is egregious and inequitable to the Debtor and its estate and should not be countenanced. Debtor submits initially that an accounting of the Lockbox Account is required in order to determine the true amount of the RCG Claim. Debtor further submits that the RCG Claim must then be recalculated so as to account for payments that could have and should have been made immediately after the Default Date as well as the application of the more than $7,600,000 RCG has received from the Default Date through October 31, 2016.

**THE NEW JERSEY FORECLOSURE ORDER**

17.    RCG asserts that the Debtor is bound by the January 8, 2016 order (the

"Foreclosure Order"), attached to the Motion as Exhibit 2.  In further support of this position,

RCG attached the transcript of the January 8, 2016 proceeding before the Honorable Francis R.

Hodgson in the Foreclosure Action.  As set forth in that transcript, the Debtor filed an objection

to the final judgment calculation in the Foreclosure Action which was opposed by RCG.  A copy

of the Certifications of Benjamin Ringel objecting to the final judgment calculation are attached

hereto as Exhibit A and incorporated herein by reference. As noted above, and as set forth in the

Ringel Certifications, Debtor's objection to the Motion and RCG's Claim is limited to RCG's

calculation of the amounts due it, including amounts for default interest, late charges, payment

after default premium and attorney's fees.

18.    The Foreclosure Order was signed and ostensibly entered in the Foreclosure

Action on January 8, 2016, prior to the Debtor commencing this Chapter 11 Case.  The

Foreclosure Order provides that "Plaintiff is entitled to judgment in the amount of

$21,856,701.80 plus legal fees awarded" and directs the matter to be returned to the foreclosure

unit .  By separate order, RCG was awarded attorney's fees in the amount of $146,494.50.

Debtor by its counsel did not consent to the form of the Foreclosure Order and its submission,

and, needless to say, the amount fixed therein.  In fact, a review of the Foreclosure Order or

shows that only RCG's counsel is a signatory to the Foreclosure Order.

19.    While RCG attached the transcript of the January 8, 2016 proceeding in support

of its Motion and the fixing of its Claim, RCG failed to include the supplemental transcript

attached hereto as Exhibit B, which transcript evidences the Debtor's objection to the entry of the

order and its impending bankruptcy case filing.  According to the supplemental transcript,

Debtor's foreclosure counsel had stepped out of the courtroom to communicate with Debtor's

bankruptcy counsel to confirm the bankruptcy filing.  When he returned to the courtroom, he

noted on the record that he had not been provided with the proposed form of order, that he did

not agree to the language set forth in the order, and that he had been conferring with Debtor's

bankruptcy counsel to confirm the Debtor's commencing its voluntary chapter 11 petition.

RCG's counsel was not present at the time that Debtor's foreclosure counsel set forth his

objection on the record.  RCG's counsel disputes certain of these contentions.  See Certification

of Donald F. Campbell, Jr. in Reply to Debtor's Opposition to RCG Motion, ECF doc. no. 42.

     20.    Regardless of the timing of entry of the Foreclosure Order, New Jersey practice

provides a party with rights to either appeal or move to reconsider entry of a judgment or order.

A motion for reconsideration is governed by New Jersey Court R. 4:49-2, which provides as

follows:

> Except as otherwise provided by Rule 1:13-41 (clerical errors), a
> motion for rehearing or reconsideration seeking to alter or amend a
> judgment or order shall be served not later than twenty days after
> service of the judgment or order upon all parties by the party
> obtaining it.  The motion shall state with specificity the basis on
> which it is made including the statement of the matters or
> controlling decisions which counsel believe the court has
> overlooked or as to which it has erred. Id. .

     21.    Reconsideration is within the sound discretion of the Court, which is to be

exercised only in the interest of justice.  Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250,

257-263 (App. Div. 1987).  Motions for reconsideration should be granted where the Court has

based its decision upon a "palpably incorrect or irrational basis," or it is obvious that the Court

did not consider and/or failed to appreciate the "significance of probative, competent evidence"

referenced in the reconsideration motion. See id. D'Atria v. D'Atria, 242 N.J. Super. 392, 401

(Ch. Div. 1990).   The standard that the Court is to apply in a motion for reconsideration was

thoroughly set forth in D'Atria v. D'Atria, 242 N.J. Super. 392, 401- 402 (Ch. Div. 1990); cited with approval, Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996):

> A litigant should not seek reconsideration merely because of dissatisfaction with a decision of the Court . . . Reconsideration should be utilized only for those cases which fall into the narrow corridor in which either: (i)  the Court has expressed its decision based upon a palpably incorrect or irrational basis; or (ii) it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence.
>
> Alternatively, if the litigant wishes to bring new or additional information to the Court's attention which could not have provided on the first application, the Court should, in the interest of justice (and in the exercise of sound discretion), consider the evidence.

22.    Appeal rights, which are governed by New Jersey Court R. 2:4-1. also remain available to the Debtor in connection with the entry of the Foreclosure Order and provide as follows:

**2:4-1. Time: From Judgments, Orders, Decisions, Actions and From Rules**

- (a) Appeals from final judgments of courts, final judgments or orders of judges sitting as statutory agents and final judgments of the Division of Workers' Compensation shall be taken within 45 days of their entry.  However, appeals from final judgments terminating parental rights shall be taken within 21 days of their entry.

23.    The Debtor's bankruptcy filing tolled the time periods with respect to reconsideration or appeal of the Foreclosure Order and the Debtor still has and is prepared to pursue all available rights and remedies with respect to its objections to the calculation of the RCG Claim whether in the New Jersey State Court or in this Bankruptcy Court forum.  As such, the Debtor submits it is not bound by the determination of the New Jersey State Court in connection with the Foreclosure Order and that this Court has jurisdiction over and the ability to make determinations with respect to the amount of the RCG Claim and hear the Debtor's

objections to the RCG Claim which have been properly preserved.

**PRINCIPAL AMOUNT OF THE LOAN**

24.     RCG asserts that no payments have been made to reduce the principal amount of

the Loan.  However, since the Petition Date, CBRE has prepared, and the Debtor has filed with

the Bankruptcy Court the monthly reports prepared by the Receiver. A review of these reports

reflects the following payments having been made to RCG through October 31, 2016:

| | |
|---|---|
| January: | $0 |
| February: | $94,158.62 |
| March: | $441,882.13 |
| April: | $120,146.91 |
| May: | $237,338.87 |
| June: | $76,916.93 |
| July: | $159,786.60 |
| August: | $156,572.06 |
| September: | $224,080.10 |
| October: | $181,714.42 |

25.     Each report contains the same line item in its general ledger and income statement

in connection with the payments made to RCG which are denominated as: "mortgage principal".

Therefore, since the Petition Date, RCG has been paid the aggregate amount of $1,692,596.64 in

debt service with respect to the Property, all designated by the Receiver as payments of mortgage

principal.  While the payments are identified in the Receiver reports as mortgage principal,

RCG's spreadsheet attached as Exhibit 6 to the Motion contains no such designation.  Instead the

spreadsheet contains a column denominated as "Total Interest Paid" for which RCG has received

the aggregate sum of $7,618,640.11 from the inception of the Loan through October 31, 2016.

The spreadsheet also contains a column denominated as "Lockbox Total Swept and Applied"

which amount totals $7,396,730.82 through October 31, 2016.  No explanation is provided as to

this inconsistency between the designation and amounts set forth in the Receiver reports and the

spreadsheet.  Furthermore, RCG contends that the principal amount of the Loan which was

originally $17,820,000 currently stands at $17,730,689.83 despite acknowledging receipt of

payments in excess of $7,700,000[1] from the Default Date through October 31, 2016.

26.     Curiously, while the spreadsheet attached purports to summarize the principal and

interest amounts owing and received in connection with the Loan Agreement, the column

identified as "Lockbox Total Swept & Applied" does not reconcile with the amounts paid to

RCG in accordance with the monthly Receiver reports during the post petition period.  For

example, the February 2016 payment of $94,158.62, the April 2016 payment of $120,146.91, the

July 2016 payment of $159,786.60 and the October 2016 payment of $181,714.42 are not

accounted for or fully accounted for in this column.

27.     As noted above, while the Loan Agreement provides RCG with discretion in

connection with how payments are to be applied from the Lockbox Account, the Loan

Agreement cannot be read to imbue RCG with the ability to collect rents in the Lockbox Account

and simply accumulate the funds indefinitely without payment towards the Loan obligation while

simultaneously charging default interest and late fees against the Debtor.  The funds deposited

into the Lockbox Account must be utilized in some manner to reduce the Loan obligation and in

fact the Loan Agreement contains specific language establishing the order of how payments must

be made by the Lockbox Bank.  Yet there are four (4) different time periods from the Default

Date through June 2014, a period of approximately 2.5 years, when RCG simply allowed the

Lockbox Account balance to accumulate deposits without any application of funds to pay down

the Loan obligation.  This is turn resulted in a substantial increase in the amounts being charged

---

1 This amount includes improperly applied late charges in the amount of $347,757.22.

against the Debtor with respect to the Loan.

28.     The Debtor submits that the various inconsistencies between the receiver reports

and the spreadsheet delineating application of the Lockbox funds raise more questions than

answers and requires a complete accounting be performed so that the parties can ascertain the

actual amounts paid and their application in order to determine the true amount due RCG.

**DEFAULT INTEREST**

29.     Default interest charges are permitted pursuant to the Loan Agreement and started

to accrue on the Loan obligation from the Default Date.  A review of the application of payments

evidences that no payments were made to RCG from the Lockbox Account from the Default

Date through February 7, 2013.  It was not until February 2013 that a $512,553.62 post default

payment of contract interest and a $1,041,444.58 post default payment of default interest appears

to have been applied[2].  The failure by RCG to apply payments on account of the loan obligation

for almost a full year increased the default balance on the loan from $17,730,689.83 as of

January 5, 2012 to $20,086,567.98 as of February 7, 2013.   See spreadsheet attached as Exhibit

F.  The Debtor should not be responsible for these increased charges when it had no control over

the funds and no ability to direct their payment.  Similarly, RCG should not be compensated for

its own conduct in not applying available funds to the loan obligation.

30.     Notably absent from the spreadsheet setting forth the payments is a column for

the Lockbox Account balance.  Debtor believes, and the bank statements attached hereto as

---

2 The Debtor does not have clear copies of the bank statements for the period January 2013 – August 2013, and by
this objection requests that copies be provided, or alternatively, reserves all rights to seek discovery from RCG,
CBRE and Signature Bank, to obtain copies of the bank statement and all other relevant documents.  It appears that
the ending balance in the January 2013 lockbox account is $1,819,843.  In February 2013, almost one year after the
Default Date, the bank statement reflects a transfer of $1,896,615.46 that is without designation on the account
statement.  Debtor assumes this transfer was made to RCG and includes the $1,553,977.60 payments noted in the
spreadsheet.

Exhibit C confirm, that there were substantial funds available to pay down the Loan obligation,

yet RCG elected not to do so.  Such failure is a breach by RCG of its obligations under the Loan

Agreement.

31.    The Reply Certification of Dean Ravosa, Chief Operating Officer of the general

partner of RCG filed in the Foreclosure Proceeding states at paragraph 9 that:

> For several months after Borrower's initial defaults, Plaintiff did not apply the Reserve Funds or the deposits held in the Lockbox Account to the balances due under the loan because Plaintiff was working with Defendants to ascertain if mutual agreement could occur on a restructure.  Plaintiff did not want to remove the funds from the Reserve Accounts of the Lockbox Account to ensure that funds were available for the operation of the underlying shopping center and also in case the parties were successful in restructuring the loans.  When it became apparent that the loan would not be agreeably restructured, Plaintiff applied the funds held in the Reserve Account and the Lockbox Account to the balances due under the Loan.  This was reasonable under the circumstances and in compliance with the terms and conditions of the Loan Agreement".

See, Reply Certification of Dean Ravosa attached hereto as Exhibit D.

32.    While RCG claims that payments were not made for "several months", the

spreadsheet shows no lockbox sweep between the Default Date and February 7, 2013, almost an

entire year.  Thereafter, the account was swept randomly at best, with sweeps occurring on

September 9, 2013, November 1, 2013, January 8, 2014 and July 1, 2014 when it appears that

more regular account sweeps commenced.  The Lockbox Account statements do not reconcile

with the spreadsheet.  Specifically, the Lockbox Bank account statements reflect the following:

January 2012:  various lockbox deposits, outgoing wire transfer to RCG of $119,684.

February 2012: various lockbox deposits, no payment to RCG, but an ending balance of $210,182.22

March 2012: various lockbox deposits, no payment to RCG, but an ending balance of $356,508.66.

April 2012: various lockbox deposits, outgoing wire transfer to RCG of $67,545, and an ending balance of $458,922.11

May 2012: various lockbox deposits, no payment to RCG, but an ending balance of $683,501.89

June 2012: various lockbox deposits, no payment to RCG, but an ending balance of $857,860.83

July 2012: various lockbox deposits, outgoing wire transfer to RCG of $75,465, outgoing wire to cover insurance costs, and an ending balance of $924,637.30.

August 2012: various lockbox deposits, no payment to RCG, but an ending balance of $1,077,075.98

September 2012: various lockbox deposits, no payment to RCG, but an ending balance of $1,197,918.57.

October 2012: various lockbox deposits, payment to RCG of $75,465, but an ending balance of $1,305,891.70

November 2012: various lockbox deposits, no payment to RCG, ending balance of $1,481,262.60

December 2012: various lockbox deposits, no payment to RCG, ending balance of $1,662,944.24.

See redacted copies of Lockbox Account statements attached hereto as Exhibit C.

33.     Clearly there was a substantial available cash balance in the Lockbox Account, which funds were not applied by RCG to pay down the RCG Loan while RCG charged the Debtor for a substantially increased principal balance as well as increased default interest charges accruing on an unnecessarily inflated principal amount.   Pre and post petition default interest charges should not be permitted in this circumstance as the Debtor is being charged a penalty for non-payment when RCG had sole dominion over the application of the funds and when funds were available to make payments to RCG.  Debtor believes the Court has the equitable power to either modify, reduce or nullify the default interest rate and that RCG's

action, or in this case, inaction combined with the substantial amounts it has recovered and

continues to receive from the rents at the Property weigh in favor of such a determination. See,

*In re 400 Walnut Assocs., L.P.*, 461 B.R. 308 (E.D. Pa. 2011).

34.     To the extent RCG is oversecured, Section 506(b) of the Bankruptcy Code

permits RCG to add post-petition interest charges to its Claim. See also, *United States V. Ron*

*Pair Enterprises, Inc.*, 489 U.S. 235 (1989). The question however is whether RCG is entitled to

recover pre and/or post petition default rate interest at the rate set forth in the Loan Agreement.

The Debtor believes this court has the discretion to and should effectuate that discretion to

modify the default interest rate based upon principles of equity in light of RCG's breach of its

obligations of the Loan Agreement as outlined above which conduct grossly inflated the amount

of the Claim for which it seeks allowance. See, *In re 785 Partners LLC*, 470 B.R. 126 (Bankr.

S.D.N.Y. 2012); *In re General Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011);

*Urban Communications PSC Ltd. P'ship v. Gabriel Capital L.P.*, 394 B.R. 325 (S.D.N.Y. 2008).

## **ATTORNEYS FEES**

35.     According to the order approving fees attached to the Motion as Exhibit 8, fees of

$146,494.50 were approved with respect to the subject Loan in the Foreclosure Proceeding.

According to the Affidavit of Attorneys Fees submitted by RCG's counsel in the Foreclosure

Proceeding, total fees due both New Jersey and New York counsel as of December 10, 2015

were $292,960.66. It appears that these amounts are split between fees incurred in connection

with the subject Loan and the Mezzanine Loan extended by RCG to Mezz which amounts were

set forth in an order entered on January 8, 2016 in the New Jersey proceeding captioned: *AC*

*Toms River Mezz, LLC, AC I Toms River LLC and AC I Inv Toms River LLC, v. RCG v.*

*Benjamin Ringel, Armstrong Capital Management and Marsyll Maintenance Corp.*, Docket No.

OCN-C-209-13.  See order attached hereto as Exhibit E.

36.     However, the fee amounts asserted do not reconcile with the various payoff letters

sent by RCG's counsel to counsel to the Debtor in the Foreclosure Proceeding.  Payoff letters

dated January 17, 2014, February 24, 2014 and May 7, 2014 (attached hereto as Exhibit F)

include a fee component only for the Mezz loan.  Further confusing matters is Exhibit 7 to the

Motion which sets forth a schedule of invoices due RCG's NJ counsel in the Foreclosure

Proceeding that total $135,103.13 through July 2016, which is an amount that is less than the

$146,494.50 amount set forth in fee order.  To the extent fees for which RCG seeks recovery

relate to the Mezz loan, they are improperly contained in the RCG Claim and the claim must be

reduced appropriately.

37.     At a minimum, time records in support of the attorney's fees requested should be

submitted for review by the Court prior to a ruling on the allowance of any such fees.

**LATE CHARGES**

38.     In addition to the inappropriate default interest charges being charged against the

Debtor, RCG also charged the Debtor with late fees from the Default Date through June 2014

despite RCG having sole dominion and control over the Lockbox Account and it failing to pay

down the Loan obligation when it should and could have done so.  The total applied late fee

payments aggregate $344,417.61.

39.     First of all, to the extent this Court determines that default interest charges are

applicable, RCG is not entitled to also recover late fees.  See In re *785 Partners LLC*, 470 B.R.

126 (Bankr. S.D.N.Y. 2012).  In that case, which was cited by RCG in support of its recovery of

default interest, bankruptcy courts have found that creditors are not entitled to both default

interest and late fees. *In re 785 Partners, LLC,* 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012)

("oversecured creditors may receive payment of either default interest or late charges, but not

both") (internal citation omitted); *see also In re 243rd St. Bronx R&R LLC*, 2013 Bankr. LEXIS

1161 at * (Bankr. S.D.N.Y. Mar. 21, 2013) (because prepetition default interest was already

allowed, bankruptcy court denied duplicative prepetition late charges). A secured creditor is

limited to reasonable fees section 506(b) of the Bankruptcy Code and because default interest

and late charges compensate a lender for the same injury, awarding both default interest and late

charges amounts to a double recovery. *Id.*

40.   Additionally, "[u]nder New York law, in the absence of a provision in the

mortgage to the contrary, the collection of late fees after a mortgage note has been

accelerated is impermissible." *4 B's Realty 1530 CR39, LLC v. Toscano*, 818 F. Supp. 2d

654, 662 (E.D.N.Y. 2011) (internal citations and quotations omitted). The basis for this

general rule is that it would be "inconsistent to allow a lending institution to accelerate a

note, thereby denying the debtor the right under the mortgage note to make monthly

installments and to continue to insist on its own right under the note to impose monthly

late charges." *Id.* (internal citations and quotations omitted)

41.   Accordingly, under either the Bankruptcy Code or New York law, the

Debtor submits that late charges or fees should not be awarded to RCG. RCG has been

accruing both default interest and charging late fees against the Debtor, but it should not

be allowed such a double recovery. Additionally, RCG has also been charging late fees

against the Debtor, despite the fact that the funds generated by the Property are no longer

in control of the Debtor.  The Debtor should not be penalized with late charges once the

cash sweep went into effect, providing RCG with sole dominion and control over the

Lockbox Account.  Any "late" payment cannot be attributed to the Debtor once RCG was

in control of the account.  *See 243rd Street*, 2013 Bankr. LEXIS 1161 at *7 (while a

receiver is in place, a secured creditor "should not receive late charges . . . for

administrative costs in dealing with a displaced borrower's late payments that it did not

incur").

42.     The RCG claim inappropriately seeks late fees in the amount of

$335,933.34.  These amounts must be deducted from the total Claim amount and the

$344,417.61 in late charges from the Default Date through July 2014 which appear to

have already been applied must also be credited back to the Debtor as it no longer had

any control over the Lockbox Account.  For all of the above reasons RCG is not entitled

to both default interest and late charges in its Claim and any late charge payments applied

after the Default Date must be credited back to the Debtor as these payments were no

longer in the Debtor's control.

**PAYMENT AFTER DEFAULT PREMIUM**

43.     The Loan Agreement contains a provision that permits RCG to charge a 5%

premium on the principal amount of the Loan to the extent there is default and RCG recovers any

payment subsequent.  Denominating what is obviously a penalty as a "premium" does not make

it an enforceable and recoverable sum as part of the RCG Claim.  While not a "make whole"

premium like the scenario this Court analyzed in *In re MPM Silicones, LLC*, 2014 WL 4436335

(Bankr. S.D.N.Y. 2914), aff'd 531 B.R. 321 (S.D.N.Y. 2015), Debtor submits that the payment

after default premium should not be allowed as part of RCG's secured claim.  Courts have found

that where a contract requires the payment of a prepayment premium, even after default, "the

clause will be analyzed as a liquidated damages clause."  *In re Madison 92nd St. Assocs. LLC*,

472 B.R. 189, 195-96 (Bankr. S.D.N.Y. 2012); *see also Northwestern Mut. Life Ins. Co. v.*

*Uniondale Realty Assoc.*, 11 Misc. 3d 980, 985 (N.Y. Sup. Ct. 2006) (payment of prepayment

premium after default analyzed as liquidated damages).  Under New York law, liquidated

damages "constitute the compensation which, the parties have agreed, should be paid on order to

satisfy any loss or injury flowing from a breach of theory contract.  *Truck Rent-A-Center, Inc. v.*

*Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 423-24 (1977).

44.      "A liquidated damage provision has its basis in the principal of just compensation

for loss."  *Id.* at 424.  However, a liquidated damage provision will not be enforced if it is against

public policy, whereby such damages would essentially act as a penalty.  *Id.*  Essentially, a party

cannot be compelled to perform "out of fear of economic devastation" and if in the event of

default the other party "would reap a windfall well above actual harm sustained."  *Id.*

Accordingly, from this reasoning, the Court of Appeals in *Truck Rent-A Center* set forth the

standard for analyzing the appropriateness liquidated damages:

> A contractual provision fixing damages in the event of breach will be sustained if
> the amount liquidated bears a reasonable proportion to the probable loss and the
> amount of actual loss is incapable or difficult of precise estimation.  If, however,
> the amount fixed is plainly or grossly disproportionate to the probable loss, the
> provision calls for a penalty and will not be enforced.  In interpreting a provision
> fixing damages, it is not material whether the parties themselves have chosen to
> call the provision one for "liquidated damages" … or have styled it as a penalty.

*Id.* at 425 (internal citations omitted).

45.      The Loan Agreement is drafted in such a manner that an Event of Default which

then triggers the cash sweep guarantees that RCG will "recover" payment after any such default

and thus trigger the 5% premium which the Debtor submits is in actuality an impermissible

penalty charge that is not recoverable.  By virtue of the express language of the Loan Agreement,

which places RCG in sole control of the Lockbox Account, RCG is guaranteed to recover an

additional $891,000, (5% of the principal amount of the Loan), which can only be construed as a

penalty against the Debtor.  RCG is not suffering any loss as it continues to recover rents which

it can and should apply to the Loan.  By way of example, a strict reading of Section 2.3.3 of the

Loan Agreement would trigger the $891,000 premium whether RCG recovers $1 or all of the

amounts due it after a default.  Since the default triggered the cash sweep resulting in RCG's

control over the Lockbox Account, RCG recovered payments after the default, and continues to

receive monthly payments post-petition.  There is simply no other way to construe this provision

other than as a penalty that is not permissible and which amount must be deducted from the RCG

Claim.

## POTENTIAL REINSTATEMENT OR DEACCELERATION OF THE RCG LOAN

46.    RCG's actions should not be rewarded by allowing its Claim in the amount

sought, which includes inappropriate late charges, attorneys' fees, and default interest charges

accruing on a principal balance that ballooned due to RCG's own failure to pay down its

obligation when it was the party with access to the funds in the Lockbox Account.  It is also

possible that the Lockbox Account contained sufficient funds to reinstate the Loan obligation

within months of the Default Date and that the more than $7,600,000 in payments made to RCG

since the Default Date have already cured, or reinstated the Loan obligation.  Alternatively,

Debtor submits that RCG is not entitled to recover any pre or post petition default interest and

the Debtor should be permitted to treat RCG's claim in accordance with Section 1124 of the

Bankruptcy Code which permits a debtor to reinstate an obligation that has gone into default.

47.    In a reinstatement (or deacceleration) scenario, RCG would not be entitled to

default interest.  See *In re Taddeo*, 685 F.2d 24 (2d Cir 1982).  The Debtor would cure the pre-

petition default and RCG would be paid the full amount of its Allowed Claim at the non-default

interest rate from the sale proceeds at the closing.  Debtor recognizes a split in the circuits,

including the  recent 9th circuit decision in *In re New Investments, Inc.*, 2016 WL 6543520 (9th.

Cir. 2016) which held that section 1123(d) of the Bankruptcy Code requires the payment of

default interest in order to reinstate under Section 1124 of the Bankruptcy Code, a 2-1 decision

that overruled *In re Entz White Lumber & Supply, Inc.* 850 F.2d 1338 (9th Cir. 1988), which

permitted a debtor to cure a default under a plan and avoid the payment of default interest.

However, *New Investments* is not binding on this Court.

48.    Removing the default interest charges would be a fair and equitable result and the

remaining balance due RCG on account of its Allowed Claim would then be satisfied in full from

the sale proceeds, with interest calculated at the contract rate from the Default Date to the closing

payment date.  To the extent RCG has been overpaid by its receipt of in excess of $7,600,000

from the Default Date through October 2016, or thereafter, such amounts must be returned or

credited to the Debtor's estate for distribution according to its liquidating plan.

49.    It is important to note that any such savings to the Debtor will in actuality benefit

RCG as once the Debtor's creditors are paid in full, any excess sale proceeds will flow to Mezz,

the Debtor's 100% owner, and RCG will be entitled to payment on account of its Mezz loan

from any remaining proceeds.

## DEMAND FOR ACCOUNTING

50.     As noted above, due to the numerous inconsistencies between the spreadsheets and other documentation submitted in the Foreclosure Action and this Chapter 11 Case, the substantial sums paid to RCG from the Default Date through October 2016, and RCG's failure to properly direct payment and thereafter account for the application of these funds in calculating its Claim, requires a full accounting and the Debtor submits that this Court should direct such an accounting be performed.  Debtor reserves all rights to seek discovery from RCG, Signature Bank as the Lockbox Bank and the Receiver, in connection therewith.

## CONCLUSION:

51.     RCG has maintained sole dominion and control over the leases and rents and the Lockbox Account since the Default Date.  Since that time, RCG has been paid in excess of $7,600,000.  RCG continues to receive and will continue to receive monthly debt service payments during the bankruptcy period.  The Debtor had no control over the Lockbox Account after the Default Date and Debtor should not be held accountable to and responsible for RCG's failure to properly apply payments and be charged default interest, late fees and other charges due to RCG's inaction.  The Debtor is being unfairly surcharged, resulting in a substantially increased ending default balance that continues to accrue interest at the default rate to this day.

52.     Without a complete and thorough accounting, including available account balances, neither this Court nor the Debtor is able to determine if there were sufficient funds available in the Lockbox account at any time to cure the initial default.  It may very well be that the Loan could have been converted to a performing loan well before the Receiver was appointed, eliminating the accrual of substantial default interest, late charges, attorneys' fees and

the attendant litigation that continues to date.

    **WHEREFORE**, the Debtor respectfully requests that this Court deny RCG's Motion in

its entirety, direct it to provide a complete accounting of the Lockbox Account and all payments

received in connection with the Loan and grant the Debtor such other and further relief as may

be just and appropriate.

**Dated:**  New York, New York
        December 8, 2016                **ROBINSON BROG LEINWAND**
                                        **GREENE GENOVESE & GLUCK P.C.**
                                        Attorneys for the Debtor
                                        875 Third Avenue, 9th Floor
                                        New York, New York 10022
                                        Tel. No.:  212-603-6300

                                        By: /s/ A. Mitchell Greene
                                        A. Mitchell Greene